**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1: 23-cr-00070-CJN** |
| | : | |
| **JESSE JAMES RUMSON,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION TO SUPPRESS

The United States of America respectfully opposes the Defendant's Motion to Suppress All Evidence Seized on February 27, 2021 [sic].[1]  ECF 27.  By his Motion, the Defendant seeks to suppress "all evidence seized, and all statements taken" during a purported "pre-dawn grenade attack and search" by the Federal Bureau of Investigation ("FBI") on February 27, 2023, when the FBI arrested the Defendant and searched his home in Lecanto, Florida, pursuant to the arrest warrant issued by this Court and the search and seizure warrant issued by the District Court for the Middle District of Florida.  ECF 27 at 1, 3-4.

Defendant's Motion is frivolous and lacks any substantial factual basis to support its claims.  In his boilerplate Motion, the Defendant requests a hearing based on conclusory assertions while ignoring the actual facts and circumstances of the arrest, search, and interview.  Because the Defendant has failed to meet his basic burden of production, his Motion should be denied.

---

[1] The Defendant repeatedly states that the arrest, search, and seizure in this case took place on February 27, 2021.  ECF 27.  As the docket in this case plainly shows, however, a warrant for the Defendant's arrest was issued in this matter in February 2023, and the Defendant was indicted in March of 2023.

## RELEVANT BACKGROUND

### I.   The Defendant Committed Multiple Felony Crimes on January 6, 2021.

On January 6, 2021, a large crowd, including the Defendant, gathered on restricted Capitol grounds and forced its way to the exterior façade and, ultimately, inside the Capitol Building as a joint session of Congress convened to certify the vote count of the Electoral College for the 2020 Presidential Election. Around 2:40 p.m., once other rioters had successfully broken open the Capitol's Parliamentary Door on the Upper West Terrace, the Defendant, who wore a large panda headpiece, ran from the Senate Wing Door, hopped over railings, and climbed the stairs to enter the Capitol through the Parliamentary Door.



*Figure 1: Defendant, in panda headpiece, jumps railing on stairs to rush the Parliamentary Door, which was breached seconds earlier.*

The Defendant was among, approximately, the first twenty rioters to enter that door after it was breached.

While inside the Capitol Building, the Defendant charged at a line of officers, forcing them to detain him and place him in handcuffs. However, because the officers inside the Capitol were

outnumbered, and facing an increasingly large and violent mob, they were not able to maintain control over the Defendant.   Therefore, he was able to exit the building (without the panda headpiece) and remove his handcuffs around 2:52 p.m.



*Figure 2: Defendant exits Capitol Building without panda headpiece,
but with hands behind his back in handcuffs.*



*Figure 3: Defendant celebrates removal of handcuffs on Upper West Terrace
while holding wooden rosary beads.*

After exiting the building, the Defendant then lingered on the Upper West Terrace for the next few hours.   During that time, among other things, he was seen near the Senate Wing Door, where he

celebrated with this arms in the air, and yelled, "GET A RAM!" as rioters attempted to breach that door for a second time.

Then, at approximately 4:20 p.m., reinforcements from nearby law enforcement agencies gathered to form a line that would eventually push rioters off the Upper West Terrace. The Defendant emerged from the back of the mob, ran towards that line of officers, reached out, and grabbed an officer's face shield, which forced the officer's head and neck back and upwards.



*Figure 4: Defendant emerges from back of mob and heads toward line of officers beginning their attempt to clear the Upper West Terrace.*



*Figure 5: Defendant makes it to front of mob and assaults Officer by grabbing the shield of the Officer's helmet, which forces the Officer's head and neck back and upwards.*

## II.     The Defendant was Arrested on February 27, 2023 and his Home was then Searched Pursuant to Valid Warrants.

For this conduct, on February 24, 2023, the Defendant was charged by criminal complaint and an arrest warrant was issued. ECF 1.  Contrary to the Defendant's assertion that he was "charged merely with misdemeanors," ECF 27 at 1, the complaint plainly charged the Defendant with felonies, including violations of 18 U.S.C. § 111(a), Assaulting, Resisting, or Impeding Certain Officers, and 18 U.S.C. § 231(a)(3), Obstruction of Law Enforcement During Civil Disorder.  ECF 1 at 1; ECF 1-1 at 16.

Before the Defendant's arrest, the FBI attempted to conduct physical surveillance on the Defendant's home in Lecanto, Florida.  However, because the home was in a rural, remote location, normal surveillance tactics were not fruitful.  Eventually, video surveillance showed that the Defendant's home was located on a dead-end dirt road.  Video surveillance also showed that the home had limited ingress and egress, and any approach to the front door to the residence required trudging through vegetation, as the home had woods on many sides.  In addition, the closest advanced medical care center was determined to be at least 61 miles away, which is always a consideration for officer and participant safety.  The FBI also had concerns regarding the presence of weapons in or around the home, given it had limited information about the home's inhabitants and the Defendant's neighbors, including those believed to be family members, and given the Defendant's demonstrated violence towards law enforcement and efforts to resist arrest on January 6.

For all these reasons, the FBI determined a SWAT arrest of the Defendant would be necessary.  Those types of arrests routinely include the use of armored vehicles and flashbangs (devices that explode with a loud bang and emit a brilliant light), tactics used to ensure the safety of law enforcement personnel and to encourage unwilling targets to exit their dwelling.  In

addition, rather than the knock-and-announce method, which requires the ability to approach the front door of the residence, the FBI's operations plan provided for announcement activation of emergency lights and the use of a speaker system.  And, although the FBI often routinely attempts "call-outs," where it calls a target to ask him to exit the home upon the FBI's arrival, here, the Defendant had no known mobile phone number; therefore, the FBI would be unable to attempt a "call-out."

Then, as planned, on February 27, 2023, between approximately 6:00 – 8:30 a.m., the FBI case agent and an accompanying SWAT team executed both the arrest warrant issued by this Court and the search warrant issued by the District Court for the Middle District of Florida.  Among other things, the search warrant permitted seizure of any "evidence or instrumentalities, in whatever form and however stored . . . of the state of mind of the subject and/ or other coconspirators, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation." [2]  It also permitted seizure of any "digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities" of the Defendant's crimes.

As planned, around 6:00 a.m., the FBI SWAT team approached the residence, activated their vehicle lights, and announced themselves over their PA system.  A short time later, after no one from the home appeared followed the FBI's orders to exit the premises, the FBI activated flashbangs outside of the home.  The Defendant left his home only after the flashbangs were

---

[2] The Defendant's motion references redactions to documents.  ECF 27 at 2 n.1.  The redactions in the government's productions are of personally identifying information of interviewees, as well as the Defendant's own address, date of birth, social security number, etc.  For example, the 73-page search and seizure document provided to the Defendant includes approximately 3 redactions, all of which were references to the Defendant's address.

activated.  No one was injured from the flashbangs, no property was damaged, and the FBI was not forced to break down any doors or enter through any windows.

In handwritten documentation from the date of arrest, as well as in various documents summarizing the search, the FBI's timeline from the day was approximately as follows:

> **TIMELINE of EVENTS** (All Times Approximate)
> 6:00 a.m. - Arrived at subject location.
> 6:05 a.m. - SWAT entered the premises
> 6:17 a.m. - Initial walk through completed by SWAT and determined all clear
> 6:49 a.m. - Entrance photographs were taken
> 7:00 a.m. - Search Team assigned and began search
> 8:10 a.m. - Search completed.
> 8:25 a.m. - Warrant was served and copy with inventory was provided.
> 8:30 a.m. - Search team exits premises and ensures that premises is secured.

Additional handwritten materials from the date of arrest also include a sign-in log of the FBI personnel involved in the search, who signed the log as they arrived for the arrest briefing at the Operations Center.  Contrary to the Defendant's assertion that the FBI "raided" his home at 4:26 a.m., ECF 27 at 1, the briefing log shows sign-in times between 5:19 a.m. and 5:35 a.m., when the FBI was not yet at the Defendant's home.  Other documentation includes a signed receipt for property form, signed by the Defendant's roommate and brother, C.R., and a search warrant execution log, which (a) stated that a copy of the search warrant was provided to C.R., and (b) included handwritten entries detailing the timing of events confirming the above, such as "6:05 am – SWAT enters premises," "6:17 am – initial walk-through completed," and "6:49 am – Entrance photographs taken."  In addition, 276 photographs were taken prior to and during the search, which were provided to the Defendant in discovery.  The exterior photographs of the residence on that date show that the sun had begun rising.  An example of one such photograph is below:



*Figure 6: Photograph taken by FBI as it approached Defendant's home for arrest and search.*

The Defendant was then placed under arrest, was handcuffed, and was transported to the Operations Center. Beginning around 6:48 a.m., he was interviewed by the FBI case agent and an additional FBI Task Force Officer. While that interview was on-going, the residence was separately searched by other FBI team members pursuant to the Florida search warrant. A small number of items were seized, including the "green/brown camouflage pants," the "gray/black/maroon jacket" the Defendant appeared to be wearing on January 6, 2021, and three digital devices.[3] The search was well-documented in real time, and was summarized extensively afterwards, documentation that has been provided in discovery.

For example, one such document indicates that the Defendant's girlfriend, S.H., provided a voluntary interview. In addition, her mobile device was seized from the Defendant's home because it was believed to be "capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities" of the Defendant's crimes, given the Defendant

---

[3] Follow-on search warrants were obtained in Florida to search these devices. However, as of the date of this filing, the Government has found no relevant evidence on these devices and, absent changed circumstances, does not intend to rely on their contents at trial.

stated during his custodial interview that his girlfriend's phone contained photographs that he requested she take to document his purported injuries, among other things.

That custodial interview was recorded by both a video and audio recording, copies of which were produced to the Defendant in discovery.  The interview was conducted only after the Defendant voluntarily signed a *Miranda* waiver—twice.  Both the search and seizure materials and the interview materials were provided to the Defendant in discovery.

Notably, the recordings begin as follows:

> **Agent:** Ok, so, I want to explain what the arrest warrant's about . . . So, everything today involves stuff at the Capitol . . . you're being charged on, there's about eight different charges . . . I'll let you take a look, and you'll get a copy, in case you have any questions about that . . .
>
> . . .
>
> [The FBI agent shows the Defendant a piece of paper, which the Defendant appears to be reading silently while the FBI agent reads aloud].
>
> Before we ask you any questions, you must understand your rights. You have the right to remain silent.  Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions.  You have the right to have a lawyer with you during questioning.  And, if you cannot afford a lawyer, one will be appointed to you for any questioning if you wish.  If you decide to answer questions now without a lawyer present, you have the right to stop answering question at any time.  . . . Do you understand that?
>
> **Rumson:** Yep.
>
> **Agent:**  Do you wish to speak with us?
>
> **Rumson:** Let's see how far it goes.
>
> **Agent:** Ok, what I need, though, is for you to read this part aloud and make just make sure that you understand it.
>
> **Rumson:** . . . [Reading] I understand my rights and at this time I am willing to answer questions without a lawyer present. . . . ..

The Defendant then signs the *Miranda* waiver once while in handcuffs, then a second time after the case agent removed his handcuffs to allow him to sign:



Furthermore, the video recording of the Defendant's interactions with law enforcement during the interview show that all participants were non-violent, calm, and even smiling, at times.

The Defendant then identified himself in pictures from January 6, 2021, and told the FBI the following, *inter alia*:

- o   When he first went inside the U.S. Capitol Building, he was carried into the building by the crowd where he immediately surrendered to officers.

- o   His flag, panda hat, and backpack were taken while he was handcuffed by law enforcement inside the U.S. Capitol.  The backpack contained miscellaneous items, including a T-shirt, orange juice, and a ballistic plate for protection.

- o   He was then beaten and handcuffed until someone in the crowd grabbed him and took him outside where he was released from his handcuffs by an unknown person.

- o   After he exited the building, he believes the police line that formed on the Upper West Terrace around 4 p.m. was formed to push people out of the area.

- o   During this encounter, Rumson was hit with a baton and observed another person being beaten by an officer. Rumson believed he may have grabbed a shield of an officer during this encounter.

- o   He did not remember grabbing the face shield of an officer, but it was possible he did so.

    o  His girlfriend had photographs of injuries he alleges he sustained from officers on January 6, 2021, including what he believed was a concussion.  However, he did not seek medical attention.

Although Defendant's Motion states that the Defendant "was given no Miranda warnings until much later" and that "he did make statements," ECF 27 at 2, the Defendant has supplied no evidence of any pre-*Miranda* statements that he seeks to suppress, much less that the above screenshot of the Defendant signing his *Miranda* waiver, with a timestamp of 6:50 a.m., was "much later" than when the 6 a.m. arrest commenced.

Contrary to the Defendant's assertion that "FBI also reportedly took DNA by force while Rumson was chained to a floor," ECF 27 at 2, upon information and belief, once the Defendant was transported into the custody of the United States Marshals, as is the case with all federal defendants, a DNA sample was lawfully collected from the Defendant pursuant to the DNA Fingerprint Act of 2005.

Then, on March 8, 2023, a grand jury returned the Indictment herein charging the Defendant with a number of crimes in connection with his criminal activity on January 6, 2021, including unlawfully entering the Capitol and later assaulting a law enforcement officer outside the building. ECF 8.

## **ARGUMENT**

The Defendant's motion seeks to suppress both the evidence seized by law enforcement and statements he made to law enforcement during his interview. ECF 27.  In a motion to suppress, the burden is on the defendant to "make specific factual allegations of illegality, to produce evidence and persuade the court that the evidence should be suppressed." *E.g., United States v. Madison*, 689 F.2d 1300, 1308 (7th Cir. 1982); *Rakas v. Illinois*, 439 U.S. 128, 132 n. 1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth

Amendment rights were violated by the challenged search or seizure.").  The Defendant's Motion does nothing of the sort.

As the above shows, the Defendant's Motion lacks specificity and is not grounded in fact or reality; moreover, he has supplied zero support for his claims because none exists.  Courts routinely reject such boilerplate motions: "[U]sing the Fourth Amendment like a wet noodle you throw up on the wall to see if anything sticks doesn't cut it in this court. If you've got a Fourth Amendment challenge that you need to make, you need to articulate the reasons for it so we do not waste anybody's time: the Government's time, my time, anybody else's time."  *See, e.g., United States v. Jackson*, Case No. 19-CR-126 (BAH), Hrg Tr. October 10, 2019, at 3-4.[4]

Contrary to the Defendant's conclusory assertions, the FBI did not execute a "grenade attack and search" "without cause."  ECF 27 at 1.  It also did not use a "no-knock entry."  *Id.* Instead, after the Defendant was charged by complaint with multiple felonies, including crimes of violence against law enforcement, the Defendant exited his home and was placed under arrest by the FBI pursuant to a lawfully issued D.C. arrest warrant.  Then, his home was searched pursuant to a lawfully issued Florida search warrant.  Contrary to his assertion that the "the government has

---

[4] *See also, e.g., United States v. Madison,* 689 F.2d 1300, 1308 (7th Cir. 1982) ("It is a well established rule that 'the burden is on the movant to make specific factual allegations of illegality, to produce evidence and persuade the court that the evidence should be suppressed.'  It is only once the defendant establishes a basis for his motion to suppress that the burden shifts to the government to prove by a preponderance of the evidence that" no violations occurred) (citations omitted); *United States v. Deserly*, No. 17-CR-217 (WMW/LIB), 2017 WL 8787046, at *7 (D. Minn. Dec. 5, 2017), *R&R adopted*, No. 17-CR-0217 (WMW/LIB), 2018 WL 740386 (D. Minn. Feb. 7, 2018) ("Defendant fails to present any specific argument in support of her Motion  . . . [she] also fails to identify any specific statements she made which would be the subject of her suppression motion. [Her filings], even when taken together, are brief, generic, and devoid of factual or legal argument specifically targeting or individually addressing any statements which she seeks to suppress in the case presently before this Court. Because Defendant has offered no sufficiently specific factual or legal grounds for suppression of any of her statements, nor even identified any specific statements she made which she believes should be suppressed, the Court recommends summarily denying Defendant's Motion . . . on the basis that Defendant has failed to meet her burden of production.") (collecting cases).

provided no grounds for the pre-dawn raid whatsoever," ECF 27 at 5, for the safety of all participants, including the Defendant and his family, the arrest and search included a SWAT team, armored vehicles, and the use of flashbangs, all of which were determined necessary by the FBI after a careful assessment of the Defendant, his home, its location, and its surroundings. Furthermore, because the Defendant signed a *Miranda* waiver, his statements are not subject to suppression, and he identified no pre-*Miranda* statements that he seeks to suppress. Therefore, the Defendant has failed to meet his burden, and his motion should be denied without a hearing.

## I. The FBI Was Not Unreasonable and Did Not Use Excessive Force when Executing the Florida Search and Seizure Warrant.

The Fourth Amendment prohibits law enforcement from conducting "unreasonable searches and seizures." U.S. Const. amend. IV. The proponent of a motion to suppress bears the burden of establishing that his Fourth Amendment rights were violated by a challenged search or seizure. *See, e.g., Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978).

Here, the Defendant's Motion is bereft of any details regarding which of Defendant's rights were violated and how. The Defendant neither alleges the FBI's tactics physically harmed anyone nor that the SWAT team caused property damage. Instead, the Defendant provides only unsupported, conclusory statements, many of which are inaccurate and/or relate to individuals other than the Defendant. ECF 27 at 1-5. These broad assertions are insufficient to carry the Defendant's burden.

### A. There was No "Pre-dawn Grenade Attack and Search."

The Defendant claims that the FBI executed a "pre-dawn grenade attack and search," ECF 27 at 1, by initiating its arrest in darkness, at 4:26 a.m. *Id.* However, the evidence flatly contradicts this assertion. The FBI team mustered between 5:19 a.m. and 5:35 a.m., well after the defendant claims they were at his home. Furthermore, various materials, including exterior

photographs sun rising behind the defendant's home, indicate that the warrant execution began at approximately 6 a.m. This was not pre-dawn, and was plainly compliant with the warrant's terms and Rule 41 of the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. Pro. 41(a)(2)(B) ("'Daytime' means the hours between 6:00 a.m. and 10:00 p.m. according to local time"); (e)(2)(A)(ii) ("The warrant must command the officer to . . . execute the warrant during the daytime, unless the judge for good cause expressly authorizes execution at another time"). Therefore, the Defendant has failed to meet his burden on this point, as no "pre-dawn raid" occurred. ECF 27 at 1.

  B.  Any Items Seized from the Defendant's Home were Lawfully Seized Pursuant to the Terms of the Florida Search and Seizure Warrant.

  "When police obtain evidence by way of an unlawful search, the exclusionary rule may require exclusion of that evidence in some circumstances." *United States v. Glover*, 681 F.3d 411, 418 (D.C. Cir. 2012). However, the "exclusionary rule has limited force in cases involving a search with a search warrant," because it was "adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges." *Id.* (internal citations and quotation marks omitted). Thus, "[o]fficers armed with a search warrant may enter a home and search for the items described in the warrant anywhere in the home where those items might be located." *United States v. Weaver*, 808 F.3d 26, 38 (D.C. Cir. 2015).

  Here, the FBI entered the Defendant's home pursuant to a lawfully obtained Florida search warrant. The terms of the Florida search warrant plainly permitted seizure of any "evidence or instrumentalities, in whatever form and however stored . . . of the state of mind of the subject and/or other coconspirators, e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation." The warrant also permitted seizure of any "digital device which is capable of containing and reasonably

could contain fruits, evidence, information, contraband, or instrumentalities" of the Defendant's crimes.

As noted above, the FBI seized two clothing items, which the Defendant appeared to be wearing on January 6, as well as three digital devices from the Defendant's home.[5]  Those items were properly seized pursuant to the warrant because they "could contain fruits, evidence, information, contraband, or instrumentalities" of the Defendant's crimes.  The Defendant's brother signed the FBI's Property Receipt Form, confirming the items seized from their shared home.  Although the Defendant now claims his brother was "conned" and "tricked" by the FBI, he provides no support for such argument.  ECF 27 at 1, 2.  The Defendant has therefore failed to meet his burden on this point, and items seized are not subject to suppression.

C.     The FBI's Use of a SWAT Team and Flashbangs was not Unreasonable.

Agents executing a search warrant must do so "in a reasonable manner, appropriately limited to the scope and intensity called for by the warrant." *United States v. Heldt*, 668 F.2d 1238, 1256 (D.C. Cir. 1981); *see also Dalia v. United States*, 441 U.S. 238, 258 (1979) ("[T]he manner in which a warrant is executed is subject to later judicial review as to its reasonableness."). "Deciding whether officers' actions were reasonable requires [the court] to balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *United States v. Ankeny*, 502 F.3d 829, 836 (9th Cir. 2007) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (internal quotation marks omitted).  "[The] common-law knock and announce principle forms a part of the reasonableness inquiry under the

---

[5] Defendant also claims the FBI seized Defendant's grandfather's cell phone. ECF 27 at 1, 2.  This assertion is unsupported by evidence and is contrary to the FBI's documentation, which does not indicate any mobile devices were seized from anywhere other than the Defendant's residence. Although Defendant's grandfather and another person inside his home voluntarily spoke to the FBI, they did not turn over any evidence.

Fourth Amendment." *Wilson v. Arkansas*, 514 U.S. 927, 930 (1995). The rule provides that "law enforcement officers, before entering the premises to be searched, [must] announce their presence and provide residents an opportunity to open the door[.]" *Jones v. Kirchner*, 835 F.3d 74, 79 (D.C. Cir. 2016) (citing *Wilson*, 514 U.S. at 931–32). As the Defendant points out, the "principle that law enforcement officers must announce their presence and provide residents an opportunity to open the door is an ancient one." *Hudson v. Michigan*, 547 U.S. 586 (2006).

On February 27, 2023, the FBI did just that when they arrested the Defendant. Moreover, the use of a SWAT team for warrant execution is "examined 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *See, e.g., Ramage v. Louisville/Jefferson Cnty. Metro Gov't*, 520 F. App'x 341, 346 (6th Cir. 2013) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). "The relevant facts for this analysis are those that the detectives knew when they made the decision to use the SWAT team for the warrant service, not the situation the SWAT team found when it actually entered the property." *Id.*

Relatedly, "[f]lash-bangs are explosive devices that create a bright flash and a simultaneous loud bang. When used properly they cause minimal damage and officers use them to stun or distract the occupants of a home and keep them from creating a safety threat." *Id.* Although the inquiry is fact-specific, courts routinely find law enforcement's use of flashbangs to be reasonable, so long as officers deploy them cautiously and for good cause. *See, e.g., id.* ("We have never held the use of a flash-bang to be excessive force, though we and other courts have expressed concern regarding their use.") (collecting cases); *Krause v. Jones*, 765 F.3d 675, 679 (6th Cir. 2014) (Fourth Amendment claims failed because (1) claimant did "not identify any way in which the device improperly seized or otherwise harmed him," (2) "the officers sought to minimize the risk of injury to themselves and others in entering the room" by using the flashbang, and (3) "[t]he suspect was

isolated in one room, precluding the risk that the flash bang could harm others, including children, the elderly or others in the wrong place at the wrong time"); *Molina v. Cooper*, 325 F.3d 963, 973 n. 7 (7th Cir. 2003) (noting the lack of cases finding use of a flash-bang to be excessive force); *cf. Estate of Escobedo v. Bender*, 600 F.3d 770, 784–86 (7th Cir. 2010) (finding excessive force where police threw flash-bang devices into rooms without first visually inspecting for people); *Estate of Smith v. Marasco*, 430 F.3d 140, 151 (3d Cir. 2005) (holding that police used excessive force when they detonated flash-bangs despite knowing that the target had a heart condition and various other health problems); *Boyd v. Benton County*, 374 F.3d 773, 779 (9th Cir. 2004) (discussing a situation in which police "throw it 'blind' into a room occupied by innocent bystanders"); *United States v. Myers*, 106 F.3d 936, 940 (10th Cir. 1997) ("The use of a 'flash-bang' device in a house where innocent and unsuspecting children sleep gives us great pause.").

In *Ramage*, for example, the Sixth Circuit affirmed the District Court's holding that the use of a SWAT team did not amount to excessive force, and the SWAT team's use of flashbangs was not unreasonable.  520 F. App'x at 346-47.  The court found reasonable law enforcement's risk assessment and its determination that a SWAT team was necessary:  from the defendant's "driver's license and court records, the detectives had reason to expect that he would be on the property; from his criminal history, they reasonably anticipated that he might be armed. This created substantial risk for the officers executing the warrant."  *Id.*   "Also, the security features at the property (fences, gate, security doors, etc.) necessitated the SWAT team's use of their tools and training."  *Id.*  "Although the officers had no way of knowing that the gate and front door would be open, they did know that they would need enough manpower to secure three separate and fortified buildings."  *Id.*  Given those factors, the Sixth Circuit "agree[d] with the district court's conclusion" that no excessive force was used.  *See id.*

In addition, the Sixth Circuit found "the SWAT officers' use of the flash-bang prior to entering the Ramage home [was] not be unreasonable . . . Ramage does not contend that she ha[d] any serious medical conditions that could have been aggravated by the startling noise." *Id.* Furthermore, the SWAT team detonated the device outside so as to pose minimum risk to persons and property inside the house. We conclude that the use of the flash-bang was reasonable here." *Id.*

The same is true here.  Prior to the arrest and search, the FBI determined the Defendant lived in a remote area, which was over an hour from any nearby hospital.  As the Defendant concedes, the Defendant's home was located on a dead-end dirt road, which was surrounded by woods on many sides. ECF 27 at 1.  The home had limited ingress and egress, and the FBI did not believe it could safely approach the home on foot to knock on its front door.  The FBI also had concerns regarding the existence of weapons in or around the home, given it had limited information about the home's inhabitants and the Defendant's neighbors, and given the Defendant's his violent actions against police officers and efforts to resist arrest on January 6, 2021.  Finally, the FBI did not have a working mobile telephone number for the Defendant because he was not believed to have one.  Therefore, it could not initiate a "call-out." Contrary to the Defendant's assertion that the FBI used "flash-bang grenades without cause," ECF 27 at 1, here, like the officers' decisions in *Ramage,* the FBI's decision to use a SWAT team and flashbangs was reasonable and appropriate.

Moreover, the Defendant has not alleged he had any serious medical conditions that could have been aggravated by the startling noise of the flashbangs, or that he or anyone else suffered any physical harm or property damage from their use.  After initially waiting to see if the Defendant would appear by obeying the commands the FBI's commands to exit over the PA system, when

the Defendant did not obey, the SWAT then team detonated the flashbangs outside, like the officers in *Ramge*, so as to pose minimum risk to persons and property inside the house.  Thus, the Defendant has failed to establish how his rights were violated by the use of the SWAT team and flashbangs, and his Motion fails on these points.[6]

> D.  <u>The Defendant Has Supplied No Evidence to Support that the FBI was Unreasonably "Combative, Intrusive, and Violent."</u>

Finally, the Defendant's conclusory assertions that the FBI was "combative, intrusive, and violent" are insufficient and fail.  ECF 27 at 1.  Even in cases where defendants made far greater showings, courts have declined to find excessive force where officers' actions were "objectively reasonable at the time."  *Ramage*, 520 F. App'x at 347.  Again here, *Ramage* is instructive.  There, Ramage argued "that the SWAT team members used excessive force by seizing her, carrying and displaying their guns, forcing her to the ground, and cuffing her hands behind her back."  *Id.*  The Sixth Circuit disagreed: "While hindsight may show that these actions were unnecessary, the officers' actions are not judged in hindsight, but by whether they were objectively reasonable at the time. The officers were within constitutional bounds to detain Ramage while the search was taking place." *Id.*  (citing *Michigan v. Summers*, 452 U.S. 692, 705 (1981)).

Here, the Defendant made no similarly specific allegations.  As noted in the facts section above, after the Defendant voluntarily exited his home, and was placed under arrest and in handcuffs.  He was then immediately transported to the Operations Center, where he signed a

---

[6] Even if the Defendant had met his burden of showing a violation, courts have repeatedly held that evidence is not automatically suppressed where entry protocols minimally violated a defendant's rights:  in *Hudson*, for example, the Supreme Court declined to apply the exclusionary rule based on a knock-and-announce violation, explaining that "the constitutional violation of an illegal *manner* of entry was *not* a but-for cause of obtaining the evidence" because "[w]hether that preliminary misstep had occurred or not, the police would have executed the warrant they had obtained, and would have discovered the gun and drugs inside the house[.]" 547 U.S. at 592.

*Miranda* waiver twice, the second time after the FBI case agent removed his handcuffs.  And video evidence of his statement shows that all the participants in the interview were non-violent, calm, and even smiled at times. Thus, the Defendant's claims here fail.

## II.   The Defendant Has Failed to Show Why Any Statements are Subject to Suppression.

Although the Defendant's Motion states that the Defendant "was given no Miranda warnings until much later" and that "he did make statements," ECF 27 at 2, the Defendant has identified no pre-*Miranda* statements that he seeks to suppress, much less that his signing of the *Miranda* waiver, twice, around 6:50 a.m. occurred was "much later" than the FBI's 6 a.m. arrival at his home.  The Defendant also does not allege that his *Miranda* waiver was not voluntary, knowing and intelligent, thus conceding the issue.  *See Miranda v. Arizona*, 384 U.S. 436, 471-72 (1966).[7]  In sum, no statements are subject to suppression.

Yet even if the Defendant had identified specific pre-*Miranda* statements, he still would not be able to show they were coerced.  In determining whether a defendant's will was overborne in a particular case, the Court has "assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).  The ultimate question is whether the suspect's "will [has been]

---

[7] Because the Defendant does not allege any Miranda warning issues, the government does not address the issue above.  However, in an abundance of caution, the government notes as follows:

The procedural safeguards in place after *Miranda* require that not only that the defendant receive proper warnings about his rights, but that "after such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Miranda*, 384 U.S. at 479. "The waiver inquiry has two distinct dimensions: waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010).  A review of the Defendant's behavior during the interview makes plain that his waiver was voluntary, knowing and intelligent.

overborne" by "coercive police activity." *Colorado v. Connelly*, 479 U.S. 157, 167, 178 n.2 (1986). If there is no coercive police activity, a statement is considered voluntary. *Connelly*, 479 U.S. at 167; *Baird v. United States*, 851 F.2d 376, 382 (D.C. Cir. 1988). *Compare United States v. Hallford*, 816 F.3d 850, 856 (D.C. Cir. 2016) (no coercive police conduct where defendant agreed to an interview with agents, agents asked "straightforward" questions in "conversational tones"; defendant was not restrained; interview lasted less than an hour; defendant questioned in a hospital and not in a police-dominated atmosphere; defendant was not tricked into answer questions; defendant's refusal to consent to a search of his vehicle showed his will was not overborne), *with Little v. United States*, 125 A.3d 1119, 1133 (D.C. 2015) (defendant chained to the ground and chair, denied counsel when requested, threatened that he would be raped if he went to jail, and accused of crimes officers knew he did not commit, was coerced into confessing).

Here, the Defendant points to nothing to suggest that any of his pre-*Miranda* statements were made in response to questions by law enforcement. Thus, any statements made before *Miranda* were merely spontaneous, were volunteered not in response to law enforcement questioning, and should not be suppressed. Similarly, the post-*Miranda* custodial interview was plainly voluntarily: the interviewing agents read the Defendant's rights to him, the Defendant then read his rights aloud, and then he twice signed a waiver form. The video recording also shows that the agents spoke to the Defendant in a conversational tone, and they did not use physical force, punishment, or threats. Instead, the Defendant can be seen smiling during the interview and talking with the agents in a collected and calm manner.

For these reasons, the Defendant has not shown that any of his statements were involuntary or were the result of coercive police tactics. Therefore, they should not be suppressed.

## CONCLUSION

For the reasons stated above, the United States respectfully requests that the Defendant's Motion to Suppress be denied without a hearing.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:     */s/ Samantha R. Miller*
SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20530
Samantha.Miller@usdoj.gov

SEAN P. MCCAULEY
Assistant United States Attorney
NY Bar No. 5600523
United States Attorney's Office
601 D Street NW
Washington, DC 20530
Sean.McCauley@usdoj.gov